## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SYNOPSYS, INC., | Civil Action No. _____ |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| REAL INTENT, INC., | |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

1.     Plaintiff Synopsys, Inc. ("Plaintiff" or "Synopsys") files this Complaint for patent infringement and demand for jury trial against Defendant Real Intent, Inc. ("Defendant" or "Real Intent"), and alleges as follows:

## NATURE OF THE ACTION

2.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq*., including 35 U.S.C. § 271, which gives rise to the remedies specified under 35 U.S.C. §§ 281 and 283-285.

## THE PARTIES

3.     Plaintiff Synopsys is a corporation organized under the laws of the State of Delaware, with its principal place of business at 675 Almanor Ave., Sunnyvale, California 94085.

4.     Synopsys is a global leader in the fields of electronic design automation ("EDA") and semiconductor intellectual property ("IP").  Synopsys develops, manufactures, sells and licenses products and services that enable designers to create, model and verify complex integrated circuit ("IC") designs from concept to silicon.  Since 1986, engineers around the world have used Synopsys technology to design, develop, test and verify trillions of integrated circuits.

5.      Among Synopsys' products are products directed to static verification.  In contrast to dynamic analysis, which looks at the circuit from the outside in (applying a stimulus to the circuit's inputs and examining the circuit's response), static verification involves analysis that looks at the circuit from the inside out (examining the circuits' inherent properties and internal structure).

6.      On information and belief, Defendant Real Intent is a corporation organized under the laws of the State of Delaware, with its principal place of business at 932 Hamlin Court, Sunnyvale, California 94089.  On information and belief, Real Intent also has offices and employees outside the U.S., as well as employees in other U.S. locations.

7.      Defendant Real Intent describes itself as a leading provider of EDA software to accelerate early functional verification and advanced sign-off of digital designs.  Real Intent describes its product capabilities as including: multi-mode clock domain crossing; multi-scenario reset domain crossing; multi-test mode DFT; multi-policy RTL linting, connectivity & glitch, hardware security, and formal linting

8.      Synopsys and Real Intent are competitors in the EDA space with respect to static verification.

**JURISDICTION AND VENUE**

9.      This is a complaint including causes of action for patent infringement arising under 35 U.S.C. §§ 271, *et seq*.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1338(a) (jurisdiction over patent actions).

10.     This Court has general personal jurisdiction over Defendant at least because Defendant is incorporated in Delaware.

11.    Venue is proper in this District under the provisions of 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b) at least because Defendant is incorporated in Delaware.  On information and belief, various third-party fact witnesses are also located within 100 miles of the Court.

12.    Defendant is additionally subject to this Court's general and specific personal jurisdiction because Defendant has sufficient minimum contacts within the State of Delaware and this District, pursuant to Due Process and/or the Delaware Long Arm Statute, 3 Del. C. § 3104. On information and belief, Defendant purposefully availed itself of the privileges of conducting business in the State of Delaware and in this District, including because Defendant regularly conducts and solicits business located within the State of Delaware and this District.

13.    Furthermore, personal jurisdiction over Defendant in this action comports with Due Process.  Defendant has conducted and regularly conducts business within the United States and with other Delaware-located businesses.  Defendant has purposefully availed itself of the privileges of conducting business in the United States, and within this District.  Defendant has sought protection and benefit from the laws of the State of Delaware at least by offering sales of products and services, including through its websites and portals, that infringe the Asserted Patents with the awareness and/or intent that they will be accessed and used by Delaware businesses. Defendant has also sought protection and benefit from the laws of the State of Delaware by selling infringing products and services to customers incorporated in Delaware, and also on information and belief to customers who have accessed and used Real Intent tools within 100 miles of the Court.  In addition, on information and belief, Real Intent has further sought protection and benefit from the laws of the State of Delaware by entering into contracts with its customers under

Delaware law.  Having purposefully availed itself of the privilege of conducting business within this District, Defendant should reasonably and fairly anticipate being brought into court here.

## PATENTS-IN-SUIT

14.    The patents-in-suit represent pioneering inventions made by Synopsys and its predecessors.   As a leading innovator in the EDA field, Synopsys has invested heavily in technology and has amassed a portfolio of patents, including United States Patent Nos. 8,607,173; 9,792,394; 8,650,513; 8,359,560; 10,289,773; and 9,529,948 (collectively, the "patents-in-suit"). The patents-in-suit generally relate to static verification of designs for integrated circuits ("ICs") and/or Systems-on-a-Chip ("SoCs").

15.    United States Patent No. 8,607,173 ("the 173 patent"), titled "Hierarchical Bottom-Up Clock Domain Crossing Verification," was duly and legally issued by the United States Patent and Trademark Office on December 10, 2013.  Synopsys is the owner of the 173 patent, and holds the exclusive right to enforce, sue, and recover damages for past and future infringements.  A copy of the 173 patent is attached as **Exhibit 1**.

16.    United States Patent No. 9,792,394 ("the 394 patent"), titled "Accurate Glitch Detection," was duly and legally issued by the United States Patent and Trademark Office on October 17, 2017.  Synopsys is the owner of the 394 patent, and holds the exclusive right to enforce, sue, and recover damages for past and future infringements.  A copy of the 394 patent is attached as **Exhibit 2**.

17.    United States Patent No. 8,650,513 ("the 513 patent"), titled "Reducing X-Pessimism in Gate-Level Simulation and Verification," was duly and legally issued by the United States Patent and Trademark Office on February 11, 2014.  Synopsys is the owner of the 513

patent, and holds the exclusive right to enforce, sue, and recover damages for past and future infringements. A copy of the 513 patent is attached as **Exhibit 3**.

18.    United States Patent No. 8,359,560 ("the 560 patent"), titled "Hierarchical Bottom-Up Clock Domain Crossing Verification," was duly and legally issued by the United States Patent and Trademark Office on February 11, 2014. Synopsys is the owner of the 560 patent, and holds the exclusive right to enforce, sue, and recover damages for past and future infringements. A copy of the 560 patent is attached as **Exhibit 4**.

19.    United States Patent No. 10,289,773 ("the 773 patent"), titled "Reset Domain Crossing Management Using Unified Power Format," was duly and legally issued by the United States Patent and Trademark Office on May 14, 2019. Synopsys is the owner of the 773 patent, and holds the exclusive right to enforce, sue, and recover damages for past and future infringements. A copy of the 773 patent is attached as **Exhibit 5**.

20.    United States Patent No. 9,529,948 ("the 948 patent"), titled "Minimizing Crossover Paths for Functional Verification of a Circuit Description," was duly and legally issued by the United States Patent and Trademark Office on December 10, 2013. Synopsys is the owner of the 948 patent, and holds the exclusive right to enforce, sue, and recover damages for past and future infringements. A copy of the 948 patent is attached as **Exhibit 6**.

## DEFENDANT REAL INTENT'S KNOWLEDGE OF THE PATENTS-IN-SUIT

21.    On information and belief, Defendant Real Intent had pre-filing notice of its infringement of the patents-in-suit. For example, Real Intent has had actual knowledge of the 394 patent since at least February 7, 2020 when the application for the 394 patent (which had already issued) was cited by a patent examiner during prosecution of a Real Intent patent application. As a result, Real Intent has been aware of the 394 patent since at least February 7, 2020. Similarly, a

patent examiner cited the application that led to the 773 patent (which had already issued) on April 3, 2020 during prosecution of a Real Intent patent application. As a result, Real intent has been aware of the 773 patent since at least April 3, 2020. By way of further example, Real Intent cited to the 513 patent in the specification of a patent application it filed with the U.S. Patent and Trademark Office on September 15, 2016. As a result, Real Intent has been aware of the 513 patent since at least September 15, 2016.

22.     On information and belief, around 2018, Real Intent also searched for and reviewed Synopsys' patents relating to verification of circuit designs (which include the patents-in-suit), and therefore has actual pre-suit knowledge of the patents-in-suit and Real Intent's infringement of the patents-in-suit for this reason as well.

23.     In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of each of the patents-in-suit since at least 2018, and no later than the filing of this Complaint.

24.     Real Intent uses Synopsys technology claimed in the patents-in-suit to compete with Synopsys. Real Intent has never attempted to acquire a license to any of the patents-in-suit, and Real Intent is not licensed to practice any of the claimed inventions of the patents-in-suit.

25.     Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the patents-in-suit. Defendant's continuing infringement of the patents-in-suit after the filing of this Complaint is particularly egregious.

**U.S. PATENT NO. 8,607,173**

26.     Amongst the innovations disclosed in the 173 patent is a method for performing hierarchical bottom-up clock-domain crossing (CDC) verification of a model of an integrated circuit (IC).  173 patent at 1:7-11.  Verifying clock-domain crossings of modern IC designs is necessarily rooted in computer technology; CDC verification is complex and time-consuming.  As IC designs grow in size and complexity, so too does the time and complexity of verifying the clock-domain crossings of an IC model.  *Id.* at 1:17-21, 2:55-58.

27.     The 173 patent's novel approach to CDC verification involves (1) identifying a module with an input and output that has not been previously abstracted or changed; (2) performing a CDC verification on the module in a bottom-up fashion; (3) replacing the verified module with a corresponding abstraction module that correctly identifies a corresponding clock-domain for each of the input and the output; (4) repeating the identifying, performing, and replacing step for each of the remaining modules; and (5) storing an updated model of the IC comprising at least a replaced module in storage.  173 patent at 1:63-2:9.  This novel approach improves on preexisting approaches to CDC verification, which involved time-consuming verification runs of an entire IC design, hiding the details of IP blocks in the design and/or partitioning the design into blocks, which often resulted in incomplete verification results.  *Id.* at 1:22-56.

28.     The 173 patent's improved CDC verification approach addresses and resolves problems in the prior art by adopting an unconventional hierarchical bottom-up approach that verifies lower level blocks of an IC design and replaces each with an abstraction module that correctly identifies the corresponding clock-domain for each input and output.  This allows for repeated verification cycles without the high burden associated with repeated runs at the SoC level and incomplete results with IP Block constraints.  These features improve the function of a

computer.  An example of this bottom-up approach is illustrated in Figure 1 of the 173 patent.

Figure 1 is a non-limiting example of a schematic of a block diagram of an IC with a plurality of

modules, M1 to M4, where M2 and M3 are lower level modules to M1, and where M4 is a lower

level module to M2.  173 patent at 3:36-43.  In the hierarchical bottom-up CDC verification

approach taught by the 173 patent, module M4 is CDC verified first and then replaced with an

abstraction module before module M2.  Likewise, module M2 is verified and replaced with an

abstraction module before module M1.  *Id.* at 3:43-57.



FIGURE 1

29.    The 173 patent also provides an inventive concept through its unconventional

approach to CDC verification.  The inventive concept includes a hierarchical bottom-up

verification process that optimizes the verification of IC designs using abstracted models.  This

approach addresses several challenges in the field of CDC verification, including optimizing for

verification efficiency, operating with the ability to handle incomplete assumptions, and managing

the tradeoff between fine-grain abstraction (which guarantees completeness of CDC verification

but bears the cost of long runtimes) and coarse abstraction (which guarantees a short runtime but

at the cost of the completeness of CDC verification) of an IC design.  173 patent at 3:13-23.  The

inventive approach strikes this balance by including block details needed for structural analysis in

the abstracted models, without addressing functional verification across module boundaries. *Id.* at 3:17-20.

30.     First, the 173 patent's approach significantly reduces the time and complexity involved in CDC verification by replacing verified modules with abstracted models. 173 patent at 3:43-51, 4:63-65, 5:55-6:8, 7:27-46. This allows for faster verification of higher-level modules as portions of the design are replaced with these abstracted models, streamlining the verification process. *Id.* at 3:44-51, 7:35-39. Second, unlike approaches which may require multiple complete runs at the SoC level, the 173 patent employs a bottom-up approach that allows for repeated verification cycles without the high burden associated with repeated complete runs at the SoC level. It starts with independent CDC runs for lower-level blocks, generating abstracted models that annotate relevant CDC information. Finally, the 173 patent effectively balances the tradeoff between fine abstraction, which guarantees completeness of CDC verification at the cost of runtime, and coarse abstraction, which offers shorter runtime at the expense of completeness. *Id.* at 3:13-17.

31.     Figure 6 of the 173 patent, reproduced below, provides a non-limiting example flowchart for creation of an abstraction of a module within an IC design. 173 patent at 2:49-50, 7:27-46, Fig. 6; *see also* Figs. 3 & 4 (illustrating non-limiting example circuit modules to be abstracted) and Fig. 5 (illustrating a non-limiting example of a module of a circuit having a virtual clock domain abstracted).



FIGURE 6

32.    Each of the inventive concepts discussed (individually and in combination) are captured by the claim elements of the 173 patent.  For example, limitations 1[a], 1[b] and 1[c] address replacing verified modules with abstracted modules; limitation 1[b] specifies a bottom-up approach; and the combination of claim elements provide for a balance of verification completeness and runtime cost.  All of these features improve the function of a computer performing CDC verification of an IC design.

## U.S. PATENT NO. 9,792,394

33.     The 394 patent teaches techniques for detecting glitches in circuit designs, especially in clock-domain crossing (CDC) paths.  A glitch generally refers to a change in the value of a signal which, if propagated to an input of a register, can cause a circuit design to malfunction.  As the 394 patent notes, an undetected bug in a circuit implementation can have a significant impact on a company's finances.  394 patent at 1:21-25.  In one well-publicized instance, a bug in a floating-point division circuit cost a company hundreds of millions of dollars, underscoring the importance of identifying problems like glitches in a circuit design at an early stage in the design process.  394 patent at 1:23-25.  Further complicating matters, today's circuit designs often include multiple clock domains.  *Id.* at 1:28-29.  As a result, signals that cross clock domain boundaries can cause data integrity problems, such as glitches, if the signals are not synchronized properly.  *Id.* at 1:31-32.

34.     To remedy this issue, circuit designs can include glitch-blocking circuitry to prevent glitches from propagating to an input of a register (e.g., a flip-flop).  394 patent at 3:63-65.  Synchronization circuitry can also act as glitch-blocking circuitry in a design with multiple clock domains because, in addition to preserving the integrity of the information carried in the clock domain crossing ("CDC") signal, the synchronization circuit can also block any glitches that may occur in that signal.  *Id.* at 4:7-11.  Figure 1B of the 394 patent, reproduced below, is a non-limiting illustration of how synchronization circuitry can serve as glitch-blocking circuitry in a design with more than one clock domain.



**FIG. 1B**

35.    Signal 162 is a CDC signal that crosses from one clock domain (152) to another (154).  394 patent at 4:20-21.  Because synchronization circuit 156 can synchronize CDC signal 162 with the second clock signal before CDC signal 162 is provided to circuitry 160, it operates to preserve the integrity of the information carried by CDC signal 162 across the two clock domains.  *Id.* at 4:21-26.

36.    Figures 2A and 2B of the 394 patent, reproduced below, provide a non-limiting example of a glitch-blocking circuit in a circuit design at higher and lower levels of abstraction. The circuit design in Figure 2A represents a higher-level abstraction, such as register-transfer level ("RTL").  394 patent at 5:12-13.  The circuit design in Figure 2B, on the other hand, represents a lower-level abstraction, such as the "netlist" level (i.e., "gate-level"), that can be obtained, for example, by synthesizing the circuit design in Figure 2A.  *Id.* at 5:36-37, 5:47-50.  The glitch-blocking circuit has an associated enable signal (210 in FIG. 2A and 222 in FIG. 2B).



**FIG. 2A**



**FIG. 2B**

37.    The lower-level abstraction of the circuit design is typically used for detecting potential glitches in the circuit design. 394 patent at 6:1-3. This is because glitches are typically present in the lower-level abstraction. *Id.* at 6:3-5. However, glitch-blocking circuits are more readily identified at a higher-level of abstraction, such as at the RTL level. *Id.* at 4:64-66. Because the lower-level abstraction produced by a synthesis tool may look very different from the higher-

level abstraction, it is difficult to determine the correspondence between signals in the higher-level abstraction and signals in the lower-level abstraction by comparing the two representations. *Id.* at 5:47-54. As a result, a typical glitch detection tool may incorrectly flag a large number of glitches in the lower-level abstraction of the circuit design because it may not take into account glitch-blocking circuitry. *Id.* at 6:8-15. In addition, even when the higher-level abstraction includes a glitch-blocking circuit, a glitch may still propagate to an input of a register in the circuit design because of design issues. *Id.* at 7:23-27.

38. To detect glitches in a circuit, the 394 patent discloses an improved and unconventional computer-implemented method of analyzing both the higher and lower level abstractions of a circuit design, such as at the RTL and netlist levels, to determine when a glitch is not blocked by a glitch-blocking circuit. 394 patent at 1:67-2:4.

39. In one embodiment, the 394 patent discloses that a higher-level abstraction (e.g., RTL) of the circuit design is analyzed to identify glitch-blocking circuits, enable signals, and blocking values. 394 patent at 6:42-44. A lower-level abstraction (e.g. netlist) of the circuit design is also analyzed to identify possible glitches. *Id.* at 6:44-50. If a glitch is detected in a signal that is supposed to be blocked by a glitch-blocking circuit (for example, when the enable signal for the glitch-blocking circuit is assigned a blocking value (*e.g.*, 0 or 1) corresponding to the enable signal), it is identified as a design problem. *Id.* at 6:63-7:2.

40. Using Figures 2A and 2B as a non-limiting example, the 394 patent discloses first analyzing the higher-level abstraction (e.g., RTL) to identify glitch-blocking circuit, an enable signal and a blocking value intended to cause the glitch-blocking circuit to block glitches. 394 patent at 5:13-28. Then analyzing the lower-level abstraction (e.g., netlist), it is determined if a glitch is not blocked when the enable signal is assigned the blocking value corresponding to the

enable signal. *Id.* at 6:65-7:2. Specifically, when the enable signal 222 in Figure 2B is assigned a blocking value, "AND" gate 212-2 is blocked but "AND" gate 212-3 is not. *Id.* at 7:7-10. Consequently, a glitch may still propagate through "AND" gate 212-3 because the glitch is not blocked by enable signal 222. *Id.* at 7:13-15. The process described by the 394 patent would thus detect this problem in the circuit design in response to determining that the possible glitch is not blocked (because the possible glitch can propagate to the input register 206-2). *Id.* at 7:16-22.

41.    Figure 3 of the 394 patent, replicated below, is a non-limiting illustration of the 394 patent's process for detecting glitches.



**FIG. 3**

42.    The 394 patent is directed to a specific technological improvement for accurately identifying glitches in a circuit design, such as CDC signals that cross clock boundaries and that can cause data integrity problems if not synchronized properly. 394 patent at 1:29-31, 1:37-39. The patented improvement determines whether a glitch is not blocked when, for example, a glitch blocking circuit is missing or the glitch blocking circuit is not operating as intended, thus allowing glitches to be caught and corrected early in the design stage to curb costly design problems. *Id.* at 1:23-27, 1:44-46.

43.    One inventive aspect of the 394 patent lies in its approach to accurately detecting problematic glitches in a circuit design. Traditional glitch detection methods often produced a

large number of false positives because they did not take into account the presence of glitch-blocking circuits.  Further, even though a circuit design can be functionally correct (e.g., a functional verification tool may not report any problems in the netlist), it can still cause glitches that go undetected by typical glitch detection tools.  394 patent at 6:26-29.  The 394 patent addresses these issues by analyzing, for example, both the RTL and netlist levels of the circuit design.  By identifying glitch-blocking circuits and their enable signals in the higher-level abstraction (e.g., RTL), the disclosed method and system can more accurately determine whether a glitch in the lower-level abstraction (e.g., netlist level) is truly problematic or not.  This leads to a more accurate and reliable glitch detection process, reducing the time and effort required to identify and fix design problems.  *Id.* at 6:44-51.  And because CDC signals are particularly susceptible to glitches, which can cause data integrity problems if not synchronized properly, this ability to accurately detect glitches in CDC signals and identify problematic CDC synchronization circuits helps ensure the reliable operation of complex circuit designs with multiple clock domains.  Analyzing multiple levels of abstraction (such as the RTL and netlist levels) to identify glitches this way was not well understood, routine, or conventional as of the 394 patent's priority date in August 2015.

44.    This inventive concept is captured in the claims of the 394 patent.  Claim elements 1[a]-[c], for example, describe analyzing a high-level abstraction of the circuit design (e.g., RTL) to identify glitch-blocking circuits, as well as an enable signal and a blocking value for each.  Claim elements 1[d]-[f], on the other hand, describe actions taken at the lower-level abstraction of the circuit design (e.g., netlist) to identify a glitch not otherwise prevented by a blocking circuit.

## U.S. PATENT NO. 8,650,513

45.     The 513 patent presents a novel method for reducing X-pessimism during simulation of a circuit design.  The 513 patent is rooted in computer technology because it pertains to circuit design and simulation.  When designing an IC, a designer can indicate that certain values are indeterminate (*i.e.*, the designer does not care what the value is).  In Verilog, which is used to represent an IC design at the RTL level, an indeterminate value is represented by an "X."  During logic synthesis, these "X" values can be exploited to determine an optimized logic circuit that uses the least number of gates.

46.     When modeling the behavior of a circuit design, however, the use of "X" values can result in behavior that is not consistent with how the circuit would behave on silicon.  For example, if one or more of the input values to a logic gate is indeterminate, the simulator may conclude that the output value of the gate is also indeterminate.  This indeterminate value will then continue to propagate throughout the circuit design as the simulation progresses.  As the 513 patent explains, "[c]onventional gate-level simulators can be pessimistic with respect to propagating indeterminate values because a simulator can end up with more indeterminate values at the outputs of the combinational block than would actually occur during the operation of the circuit."  513 patent at 5:53-57.  This phenomenon is frequently referred to as "X-pessimism."

47.     In a circuit design that includes one or more reconvergent paths (e.g., a path in which an input signal splits and then later reconverges), the output of a gate may be deterministic when implemented on silicon yet modeled as indeterminate during simulation due to X-pessimism. The 513 patent discloses and claims a method for reducing X-pessimism in designs that contain such reconvergent paths.

48.    Specifically, the 513 patent discloses analyzing a circuit design to identify a set of reconvergent inputs of a combinational block, and then determining whether those reconvergent inputs are likely to result in X-pessimism.  If so, the 513 patent discloses that a "correcting block," which may include additional logic gates, can be added to the design to produce "the value that an actual circuit would produce."  513 patent at 7:66-8:3.  A non-limiting example implementation of a correcting block is depicted in Figures 5A and 5B of the 513 patent, which are reproduced below.



**FIG. 5A**



**FIG. 5B**

49.    The 513 patent is directed to a specific improvement in computer technology, namely, improving the results of circuit simulations by reducing the negative impact of X-pessimism.  More specifically, when X-pessimism is reduced consistent with the teachings of the 513 patent, the result is a technical improvement in which simulation results are more "consistent with the expected behavior of a chip that is manufactured based on the circuit design."  513 patent at 1:49-53.

50.    Moreover, the 513 patent contains an inventive concept, which includes use of the correcting block described and claimed in the 513 patent.  The "correcting block" approach to reducing X-pessimism was not well understood, routine, or conventional as of the patent's priority

date in June 2011.  As the 513 patent specification explains, "conventional" approaches to simulation often exhibited X-pessimism, because they would propagate more indeterminate values than would actually be present during operation of the circuit on silicon.  513 patent at 5:63-67.

51.    This inventive concept is captured in the claims of the 513 patent.  Claim elements 1[a]-1[b], for example, describe adding a correcting block to the gate-level design in cases where a combinational block in the design is expected to exhibit X-pessimism.

### U.S. PATENT NO. 8,359,560

52.    The 560 patent presents a novel method for debugging IC designs at multiple design levels.  When designing integrated circuits, designers often work at the RTL level (*i.e.*, Verilog or VHDL), and then use a synthesis tool to convert their design to the gate level (or "netlist" level).  However, many design issues, such as manual design changes, timing optimizations, and post-synthesis debugging, can only be discovered at the gate level.  As circuit designs became increasingly complex, debugging and tracing signals between two different design levels became a "technological bottleneck in the chip design industry."  560 patent at 1:30-33.

53.    The 560 patent addresses that technological bottleneck by enabling the synchronous debugging of an IC design at both the RTL level and the gate level.  Specifically, the 560 patent discloses an embodiment that uses at least two debugging processes, each corresponding to a design level (*e.g.*, RTL level or gate level).  These debugging processes are each presented in a set of windows, each of which also corresponds to a design level.  In that embodiment, when a user interacts with a signal in a first set of windows (*e.g.*, corresponding to the RTL level), a corresponding signal in a second set of windows (*e.g.*, corresponding to the gate level) is automatically selected.  This innovation allowed IC designers to "browse and trace the two design levels at the same time, thus significantly reducing the debugging time for complex designs."  560

patent at 1:37-39.  These features of the 560 patent improve the function of a computer when performing processes for debugging IC designs.  An example of this embodiment is depicted in Figure 7 of the 560 patent, which is reproduced below.



FIG.  7

54.     The 560 patent is directed to a specific technological improvement, namely, improving the process for debugging IC designs created using, for example, an RTL such as Verilog or VHDL.  As the 560 patent explains, prior to April 2011, a technological bottleneck existed due to the difficulty of debugging and tracing signals when an issue was identified at the gate level.  560 patent at 1:30-33.  The 560 patent eliminates that bottleneck by providing improved computer functions that allow designers to browse and debug an IC design at two design levels simultaneously, which resulted in a significant reduction in the time required to debug complex circuit designs.

55.     In addition, the multi-level debugging scheme described and claimed in the 560 patent represented an inventive concept that was not well understood, routine, or conventional as of the priority date of the 560 patent.  Prior art approaches to debugging circuit designs required debugging IC designs separately at each design level, resulting in a time-consuming and complex

debugging process. The 560 patent's disclosures regarding synchronous debugging of an IC design at multiple design levels represented a new approach that was not well understood, routine, or conventional in the EDA industry.

56.     This inventive concept is captured in the claims of the 560 patent.  For example, claim element 1[b] describes the use of at least two design windows to load and present descriptions of the design at different design levels.  By way of further example, claim element 1[e] describes the use of at least two debugging processes, each of which is in control of one of the design windows.

## U.S. PATENT NO. 10,289,773

57.     The 773 patent presents a novel method for managing reset domain crossings ("RDCs") in integrated circuit designs by leveraging information from the Unified Power Format ("UPF") description, which is typically used for power domain management.  Traditionally, RDCs and power domain crossings ("PDCs") have been handled separately, leading to redundancies in isolation structures.  773 patent at 2:18-21.  Because an IC designer must use separate design and verification tools to address RDC and PDC issues, the designer often generates isolation and synchronization circuitry to address RDC issues that is different from isolation circuitry generated to address PDC issues, even when some of the circuitry could be efficiently "shared" (i.e., utilized to address both RDC issues and related PDC issues).  *Id.* at 2:29-35.  One technological innovation the 773 patent provides lies in the recognition that signals cross both reset and power domains, creating an opportunity to optimize the design by sharing isolation circuits.  *Id.* at 2:35-39.

58.     Isolation gates are circuit elements used particularly in IC designs with multiple power domains and/or reset domains.  Their primary function is to prevent the propagation of undefined or unwanted signals between these domains when one domain is powered down or in a

reset state, while the other domain is active. When a domain is not active, its output signals could have unpredictable values. Without isolation gates, these signals could propagate to the active domain, potentially causing malfunctions or incorrect behavior. When the source domain is active and functioning correctly, the isolation gate allows the signal to pass through normally. However, when the source domain is powered down or in reset, the isolation gate clamps the output signal to a known safe value (either logic high or logic low), preventing any unpredictable or floating values from reaching the active domain.

59.    Figures 2 and 9 of the 773 patent, below, are non-limiting examples that illustrate the process disclosed in the 773 patent.



FIG. 2                    FIG. 9

60.    The 773 patent teaches a method to analyze both the hardware description language ("HDL") and UPF descriptions of a circuit design to identify signals that generate both RDCs and PDCs.   773 patent at 3:17-30.   By flagging these signals as candidates for shared isolation,

designers can avoid redundant isolation gates, thereby reducing circuit size and signal delays. *Id.* at 3:17-30.

61.     By sharing isolation circuits, the overall design becomes more compact and efficient. Fewer isolation gates lead to reduced signal delays, improving overall circuit speed. The use of modified UPF descriptions and existing UPF tools automates the process of generating isolation structures for RDCs, saving designers time and effort. 773 patent at 6:17-22. The coordination of RDC and PDC management improves the overall verification process, reducing the risk of metastability issues. *Id.* at 1:13-23.

62.     This method is captured in claim 1 of the 773 patent. Claim element [1b], for example, calls for analyzing both an initial HDL and UPF description in order to identify a signal that forms both a corresponding RDC and PDC. By way of further example, claim element [1c] calls for generating a report wherein a signal is a candidate for a shared RDC/PDC isolation structure.

## U.S. PATENT NO. 9,529,948

63.     The 948 patent introduces a novel method to optimize functional verification by minimizing the number of crossover paths that need to be evaluated. A crossover path is a signal path in an IC design that crosses from one power domain to another. 948 patent at 1:62-2:4, 7:9-12.

64.     Prior methods typically analyzed all crossover paths, regardless of their relevance to the circuit's functionality in different power states. 948 patent at 1:46-52. The method of the 948 patent innovatively leverages low power information from the power design description, typically in the form of UPF files, for insights into the power states and operating conditions of different power domains within the circuit.

65. By analyzing the low power information, the method of the 948 patent identifies the power state combinations that are relevant for functional verification. This allows for the generation of a reduced set of functional crossover paths, which are a subset of the total crossover paths in the circuit. 948 patent at 2:53-59. By focusing verification efforts on these functional crossover paths, the computational burden is significantly reduced, leading to faster and more efficient verification.

66. The 948 patent's approach marked a significant departure by intelligently selecting only the functional crossover paths for analysis. By analyzing a smaller set of paths, the overall verification time is significantly reduced because there are fewer paths to analyze, thereby lowering computational demands of verification. Figure 4 of the 948 patent, reproduced below, depicts a non-limiting example of this approach.



**FIG. 4**

67. Because the 948 patent employs a static analysis approach, rather than simulation, it is faster and more efficient.

68. The 948 patent is directed to a specific improvement in computer technology, leveraging low power information to minimize the number of crossover paths that are evaluated in functional verification of a circuit design. This innovative approach leads to faster, more efficient, and resource-conscious verification, ultimately contributing to accelerated IC design cycles.

69. Moreover, the 948 patent contains an inventive concept, which involves generating a list of all crossover paths. 948 patent at claim element 1[a]. It also utilizes power information to define the possible power state combinations. *Id.* at claim element 1[b]. By considering both sets of information, the claimed method is then able to generate a second, smaller set of crossover paths by considering only those paths from the first set that are functional under at least one of the allowed power state combinations. *Id.* at claim element 1[c]. A path is excluded if a power domain containing either the path's start or end point is switched off under all allowed power state combinations. *Id.* at 3:57-65, 8:61-67. Conversely, a path is included if both its start and end power domains are switched on under at least one allowed combination. *Id.* The patented method of the 948 patent performs functional verification only on this reduced set of crossover paths in order to identify circuit description errors. *Id.* at claim element 1[d]. This method avoids unnecessary analysis of crossover paths that will not be active during the resulting chip's operation, thus saving evaluation time and preventing the identification of false errors.

## COUNT 1: INFRINGEMENT OF U.S. PATENT NO. 8,607,173

70. Synopsys repeats, incorporates by reference, and realleges all foregoing paragraphs of this Complaint as if fully set forth herein.

71.    As explained above, the 173 patent claims a novel method for performing hierarchical bottom-up clock-domain crossing (CDC) verification of a model of an integrated circuit (IC).  Real Intent has directly infringed and continues to infringe at least claim 1 of the 173 patent by making, using, offering for sale within the United States and/or importing into the United States its Accused Products.  Claim 1 of the 173 patent discloses:

1. A method for clock-domain crossing (CDC) verification of a model of an integrated circuit (IC) comprising a plurality of modules, the method comprising:

identifying a module from among the plurality of modules that has not been previously abstracted or that has not changed since a previous abstraction, the module having an input and an output;

performing a CDC verification on the module in a bottom-up fashion by a computer processor device;

replacing the module with a corresponding abstraction module that correctly identifies a corresponding clock-domain for each of the input and the output, the replacing performed in response to the module successfully passing the respective CDC verification;

repeating the identifying, performing, and replacing for each of the remaining modules from among the plurality of modules; and

storing an updated model of the IC comprising at least a replaced module in storage.

72.    The Real Intent products that infringe the 173 patent include at least Meridian CDC and any other product incorporating substantially similar functionality (the "173 Accused Products").  On information and belief, the 173 Accused Products satisfy all limitations of at least claim 1 of the 173 patent.

73.    Claim 1 of the 173 patent recites "[a] method for clock-domain crossing (CDC) verification of an integrated circuit (IC)…."  The 173 Accused Products satisfy this aspect of claim

1.  For example, Real Intent's website[1] explains that Meridian CDC "enables quick clock domain crossing verification, from individual blocks to billion-gate SoC designs."

74.    Claim 1 of the 173 patent further recites "identifying a module…."  The 173 Accused Products satisfy this aspect of claim 1.  For example, Real Intent's website discloses that Meridian CDC operates with a "hierarchical flow".[2]

> **Hierarchical CDC Methodology**
>
> Meridian CDC's hierarchical capability allows users to perform clock domain crossing verification on billion-gate SOCs within a matter of hours.
>
> The hierarchical flow is founded on a unique transparent hierarchical model derived from block-level CDC analyses, and can be used at the chip level. This unique model provides unprecedented productivity gains with flat CDC accuracy.
>
> As a result, it delivers seamless hierarchical debug which is equivalent in accuracy to a flat run.

By way of further example, Real Intent discloses that "[i]n hierarchical CDC verification, each IP or block is verified and its CDC information is saved.  As higher-level subsystems or SOCs are assembled, the CDC information from the lower levels is used at the top level for CDC verification."[3]

75.    Claim 1 of the 173 patent further recites "performing a CDC verification…."  The 173 Accused Products satisfy this aspect of claim 1.  For example, a Real Intent slide from a public presentation illustrates an exemplary "hierarchical flow" implemented in the Meridian CDC product.[4]

---

[1] https://www.realintent.com/clock-domain-crossing-meridian-cdc/.
[2] https://www.realintent.com/clock-domain-crossing-meridian-cdc/.
[3] https://dvcon-proceedings.org/wp-content/uploads/fully-hierarchical-cdc-analysis-using-comprehensive-cdc-meta-database.pdf.
[4] https://www.realintent.com/hierarchical-clock-domain-crossing-samsung-meridian-cdc/.



By way of further example, Real Intent's Director of Application Engineering, Roger Hughes, explained in a YouTube video that "Meridian hierarchical CDC flow allows maximum flexibility by enabling bottom-up or top-down CDC analysis."[5]  By way of further example, Real Intent's online help for Meridian CDC depicts the bottom-up CDC verification capability of Meridian CDC.[6]

---

[5] https://www.youtube.com/watch?v=DsBIIqE4r34.
[6] Ex. 9 at 64.



76.    Claim 1 of the 173 patent further recites "replacing the module with a corresponding abstraction module…."  The 173 Accused Products satisfy this aspect of claim 1. For example, Real Intent's website describes a "meta-database" in which the abstraction modules for a given IC component are stored:[7]

**Three-Step CDC Sign-off Methodology**

Samsung established a three-level clock domain crossing sign-off flow for their IP and the full SoC.

1. The IP is signed off on Meridian CDC and then Meridian's CDC meta-database is checked into the IP management system.
2. The IP meta-database created in step 1 is used for CDC sign-off of the next-level (multiple-IP) blocks. The CDC meta-database is also checked into the IP management system.
3. The IP and next-level block CDC metadata is used to complete CDC sign off for the SoC.

---

[7] https://www.realintent.com/hierarchical-clock-domain-crossing-samsung-meridian-cdc/.

77.     Real Intent's website also includes slides that depict some of the information saved

in its "meta-database."[8]



On information and belief, at least the "CDC Meta-database model" depicted in the above image

is saved by the 173 Accused Products.

78.     Claim 1 of the 173 patent further recites "repeating the identifying, performing, and

replacing…."  The 173 Accused Products satisfy this aspect of claim 1.  For example, Real Intent

discloses that "[i]n hierarchical CDC verification, each IP or block is verified and its CDC

information is saved.  As higher-level subsystems or SOCs are assembled, the CDC information

from the lower levels is used at the top level for CDC verification."[9]  Real Intent's website[10] also

describes the iterative nature of CDC verification in the Meridian CDC product:

---

[8] https://www.realintent.com/hierarchical-clock-domain-crossing-samsung-meridian-cdc/.
[9] https://dvcon-proceedings.org/wp-content/uploads/fully-hierarchical-cdc-analysis-using-comprehensive-cdc-meta-database.pdf at 1.
[10] https://www.realintent.com/hierarchical-clock-domain-crossing-samsung-meridian-cdc/.

## Three-Step CDC Sign-off Methodology

Samsung established a three-level clock domain crossing sign-off flow for their IP and the full SoC.

1. The IP is signed off on Meridian CDC and then Meridian's CDC meta-database is checked into the IP management system.
2. The IP meta-database created in step 1 is used for CDC sign-off of the next-level (multiple-IP) blocks. The CDC meta-database is also checked into the IP management system.
3. The IP and next-level block CDC metadata is used to complete CDC sign off for the SoC.

79.     Claim 1 of the 173 patent further recites "storing an updated model of the IC…." The 173 Accused Products satisfy this aspect of claim 1.  For example, as Real Intent's Mr. Hughes explained, "SoC verifications rely on models generated by the CDC tool on previous IP level runs.…  Meridian CDC hierarchical flow distinguishes itself by creating a transparent model database for hierarchical CDC analysis, which provides maximum visibility to the IP-level CDC data."[11]

80.     On information and belief, Meridian CDC creates an updated model of the IC that comprises the abstraction models created during the block-level CDC verification process.  In this manner, Meridian CDC can achieve greater efficiency during chip-level verification over flat CDC analysis.

81.     In light of the following materials, Real Intent directly infringes at least claim 1 of the 173 patent, either literally or under the doctrine of equivalents, through at least its use of the 173 Accused Products, including, for example, testing the 173 Accused Products.

82.     Additionally, all requirements by Real Intent on its customers to perform one or more steps recited in claim 1 of the 173 patent, and any such action by Real Intent customers, is

---

[11] https://www.youtube.com/watch?v=DsBIIqE4r3.

attributable to Real Intent such that Real Intent is directly liable for joint infringement of claim 1, because Real Intent directs and controls the conduct of its customers with respect to infringement. In this regard, Real Intent conditions participation in activities, as well as the receipt of benefits, upon performance of any such step by its customer and end-users, and Real Intent establishes the manner and timing of that performance

83.    On information and belief, Real Intent enters into contractual arrangements with its customer for use of the 173 Accused Products, including Meridian CDC.  Thus, on information and belief, Real Intent has contracted and continues to contract with its customers to perform the claimed methods of the 173 patent, including claim 1 of the 173 patent.

84.    On information and belief, Real Intent conditions participation in performing CDC verification, a vital aspect of IC verification, on the performance of claim 1 of the 173 patent.

85.    On information and belief, Real Intent conditions the receipt of the benefit, such as CDC verification, upon performance of the steps of the claim 1 of the 173 patent.  On information and belief, Real Intent customers can neither use the 173 Accused Products without entering into a contract with Real Intent, nor use the 173 Accused Products for CDC verification of IC designs without performance of the steps of at least claim 1 of the 173 patent.

86.    On information and belief, Real Intent established the manner and timing of customer performance of one or more steps of the 173 patent.  For example, as alleged herein, Real Intent requires its customers to enter into contracts in order to access the 173 Accused Products and, upon information and belief, these contracts control the number of customer engineers that can access the 173 Accused Products and where they can access.  As a further example, Real Intent employs application engineers who work with customers to setup and optimize their use of Real Intent's tools.  On information and belief, these application engineers establish the manner in

which its customers perform CDC verification by leveraging information from the customers in order to optimize verification time and accuracy. Real Intent also touts advantages of the claim 1 of the 173 patent, including, for example, by advertising Samsung's performance of the claimed patent (in the above cited case study). By way of further example, Real Intent's online help for Meridian CDC promotes the benefits of bottom-up CDC verification, including "faster processing time at the top level, simpler verification report … [and] ensuring correctness of environment specification at the top level vs. the lower level."[12]

87.    Additionally, Real Intent is liable for inducing infringement of the 173 patent by its customers, either literally or under the doctrine of equivalents. As shown above, Real Intent's customers perform all steps of claim 1 of the 173 patent when performing CDC verification using the 173 Accused Products. As alleged herein, Real Intent knew of the 173 patent at least as early as 2018, and knew or should have known that the bottom-up approach to CDC verification implemented in the 173 Accused Products infringes at least claim 1 of the 173 patent. On information and belief, Real Intent intended for its customers to infringe claim 1 of the 173 patent at least as early as 2018.

88.    Insofar as Real Intent contends it was unaware of the 173 patent and/or the infringement thereof as a result of the bottom-up approach to CDC verification implemented in the 173 Accused Products, any conceivable lack of knowledge is solely owing to Real Intent's willful blindness. Real Intent has been aware that its Meridian CDC products compete with Synopsys' SpyGlass and VC SpyGlass products. Real Intent has also been aware that Synopsys' SpyGlass and VC SpyGlass products compete in static verification. Real Intent has also been aware that Synopsys has a significant patent portfolio. Therefore, Real Intent has also been aware

---

[12] Ex. 9 at 63.

that Synopsys has patents covering static verification, including CDC verification. Additionally, Real Intent benchmarks its products against Synopsys' products, and therefore, is aware of Synopsys' products' capabilities, including, on information and belief, product capabilities related to CDC verification. Thus, based on Real Intent's awareness of Synopsys' presence in the market, Synopsys' competitive products, and Real Intent's awareness of other Synopsys' patents related to static verification, as well as based on information and belief, Real Intent subjectively believed that there is a high probability that Synopsys held patents on static verification, including CDC verification, which Real Intent's customers would infringe through their use of the 173 Accused Products, and Real Intent attempted deliberate actions to avoid learning of these facts.

89.    For at least these reasons, as well as the additional following reasons, Real Intent's direct and indirect infringement of the 173 patent has also been, and continues to be, deliberate, intentional, egregious, willful and in reckless disregard of at least claim 1 of the 173 patent, entitling Synopsys to enhanced damages and attorneys' fees under 35 U.S.C. §§ 284 and 285.

90.    As alleged herein, Real Intent knew of the 173 patent at least as of 2018.

91.    On information belief, Real Intent's actions of directly infringing and inducing others to infringe the 173 patent were deliberate and intentional with no reasonable validity defense.

92.    On information and belief, Real Intent developed the accused features of the 173 Accused Products to compete with Synopsys despite having knowledge that such actions infringe the 173 patent.

93.    Synopsys has been injured, and will continue to be injured, by Real Intent's deliberate and intentional direct and indirect infringement of the 173 patent.

## COUNT 2: INFRINGEMENT OF U.S. PATENT NO. 9,792,394

94.     Synopsys repeats, incorporates by reference, and realleges all foregoing paragraphs of this Complaint as if fully set forth herein.

95.     As explained above, the 394 patent describes a method of analyzing a higher-level abstraction (*e.g.*, RTL level) of the circuit design to identify glitch-blocking circuits, enable signals, and blocking values.  It also includes analyzing a lower-level abstraction (e.g., netlist level) of the circuit design to identify possible glitches.  If a glitch is detected in a signal that is supposed to be blocked by a glitch-blocking circuit, the method identifies it as a design problem.  Real Intent has directly infringed and continues to infringe at least claim 1 of the 394 patent by making, using, offering for sale within the United States and/or importing into the United States its Accused Products.  Claim 1 of the 394 patent discloses:

> 1. In an electronic design automation (EDA) software tool in a computer, a method for detecting design problems in a circuit design, the method comprising:
>
> analyzing a higher-level abstraction of the circuit design to identify (1) a set of glitch-blocking circuits, and (2) for each glitch-blocking circuit in the set of glitch-blocking circuits:
>
>> (i) an enable signal corresponding to the glitch-blocking circuit, and
>>
>> (ii) a blocking value corresponding to the enable signal which, when assigned to the enable signal, is supposed to cause the glitch-blocking circuit to block glitches;
>
> analyzing a lower-level abstraction of the circuit design to identify a possible glitch in a first signal in the lower-level abstraction of the circuit design, wherein the lower-level abstraction of the circuit design is generated from the higher-level abstraction of the circuit design;
>
> identifying a first enable signal in the lower-level abstraction of the circuit design that corresponds to a glitch-blocking circuit that is supposed to block glitches in the first signal; and
>
> detecting a design problem in the circuit design in response to determining that the possible glitch in the first signal is not blocked when the first enable signal is assigned a first blocking value corresponding to the first enable signal.

96.    The Real Intent products that infringe the 394 patent include at least Meridian CDC, SafeConnect and any other product incorporating substantially similar functionality (the "394 Accused Products").  On information and belief, the 394 Accused Products satisfy all limitations of at least claim 1 of the 394 patent.

97.    **Exhibit 7** is a Real Intent presentation entitled "RTL and Netlist Glitch Verification - Meridian CDC" from its presentation at DVCON 2025, the Design & Verification Conference & Exhibition.  Slide 15 from Exhibit 7, reproduced below, depicts use of Meridian CDC and SafeConnect for "Glitch Sign-off Flow," including for glitches on "CDC Paths."[13]



98.    Claim 1 of the 394 patent recites "a method for detecting design problems in a circuit design…."  The 394 Accused Products satisfy this aspect of claim 1.  For example, Slide 15 reproduced above shows that the 394 Accused Products are used in "Glitch Sign-Off Flow," which is a method for detecting design problems.

99.    **Exhibit 8** is a Real Intent tutorial presentation on "CDC Verification."  Slide 11 from the tutorial of Exhibit 8 is reproduced below.

---

[13] Ex. 7 at 15.



100. Claim 1 of the 394 patent further recites "analyzing a higher-level abstraction of the circuit design to identify (1) a set of glitch-blocking circuits, and (2) for each glitch-blocking circuit in the set of glitch-blocking circuits." The 394 Accused Products satisfy this aspect of claim 1. For example, Slide 11 from Exhibit 8 confirms that 394 Accused Products perform "glitch" detection at the "Gate-Level Netlist" (e.g., the lower-level of abstraction) to "[e]nsure no … glitch [is] introduced during synthesis." Slide 11 also explains that at the block level (*e.g.*, higher-level of abstraction), the 394 Accused Products verify downstream logic is robust against metastability. On information and belief, Slide 11 evidences that the 394 Accused Products analyze higher-level abstractions, such as the "Block" or RTL level to identify glitch blocking circuits.

101. Slides 58 and 59, reproduced below, are also part of the tutorial of Exhibit 8.[15]

---

[14] Exhibit 8 at 11.
[15] Exhibit 8 at 58-59.





102.   Claim 1 of the 394 patent further recites "an enable signal corresponding to the glitch-blocking circuit…."  The 394 Accused Products satisfy this aspect of claim 1.  For example, slides 58 and 59 confirm that the 394 Accused Products "detect[] synchronized CNTL signal(s) blocking or controlling DATA signals."  On information and belief, slides 58 and 59 thus evince

that Meridian CDC assigns enable signals, which correspond to glitch-blocking circuitry (e.g., a synchronization circuit).

103.    Claim 1 of the 394 patent further recites "a blocking value corresponding to the enable signal which, when assigned to the enable signal, is supposed to cause the glitch-blocking circuit to block glitches…." The 394 Accused Products satisfy this aspect of claim 1. For example, slides 58 and 59 of Exhibit 8 (reproduced above) confirm that the 394 Accused Products "detect[] synchronized CNTL signal(s) blocking or controlling DATA signals." On information and belief, slides 58 and 59 establish that Meridian CDC assigns blocking values to enable signals, which when assigned, cause the corresponding glitch-blocking circuit (e.g., synchronization circuit) to attempt blocking glitches.

104.    Slide 6, reproduced below, is also part of Exhibit 7, Real Intent's 2025 DVCON presentation.[16]



105.    Claim 1 of the 394 patent further recites "analyzing a lower-level abstraction of the circuit design to identify a possible glitch in a first signal in the lower-level abstraction of the

---

[16] Ex. 7 at 6

circuit design, wherein the lower-level abstraction of the circuit design is generated from the higher-level abstraction of the circuit design…." The 394 Accused Products satisfy this aspect of claim 1. For example, slide 6 of Exhibit 7 shows that the 394 Accused Products perform glitch detection using both the "RTL" and "NETLIST" levels of abstraction, thereby analyzing a lower-level of abstraction.

106. Claim 1 of the 394 patent further recites "identifying a first enable signal in the lower-level abstraction of the circuit design that corresponds to a glitch-blocking circuit that is supposed to block glitches in the first signal…." The 394 Accused Products satisfy this aspect of claim. For example, slide 6 of Exhibit 7 reflects that the 394 Accused Products identify corresponding circuity between the higher-level (*e.g.*, "RTL") and lower-level (*e.g.*, "NETLIST") in order to perform glitch detection.

107. Claim 1 of the 394 patent further recites "detecting a design problem in the circuit design in response to determining that the possible glitch in the first signal is not blocked when the first enable signal is assigned a first blocking value corresponding to the first enable signal." The 394 Accused Products satisfy this aspect of claim 1. For example, Real Intent's website[17] states that "Meridian CDC enables all aspects of CDC sign-off, including identifying issues related to metastability, loss of correlation, and glitch propagation." In addition, Slide 15 from Exhibit 7, discloses use of the 394 Accused Products for "Glitch Sign-off," which includes detecting design problems such as glitch propagation.

108. In light of the materials discussed herein, Real Intent directly infringes at least claim 1 of the 394 patent, either literally or under the doctrine of equivalents, through at least its use of the 394 Accused Products, including, for example, testing the 394 Accused Products.

---

[17] https://www.realintent.com/clock-domain-crossing-meridian-cdc/

109.    Additionally, all requirements by Real Intent on its customers to perform one or more steps recited in claim 1 of the 394 patent, and any such action by Real Intent customers, is attributable to Real Intent, such that Real Intent is directly liable for joint infringement of claim 1 of the 394 patent, because Real Intent directs and controls the conduct of its customers with respect to infringement.  In this regard, Real Intent conditions participation in activities, as well as the receipt of benefits, upon performance of any such step by its customer and end-users, and Real Intent establishes the manner and timing of that performance.

110.    On information and belief, Real Intent requires that customers enter into contractual arrangements for access to the 394 Accused Products, including, for example, Meridian CDC. Thus, on information and belief, Real Intent has contracted and continues to contract with its customers to perform the claimed method, including claim 1 of the 394 patent.

111.    On information and belief, Real Intent conditions participation in the use of the 394 Accused Products, such as Meridian CDC, upon performance of claimed steps of the 394 patent for glitch detection of circuit designs.  On information and belief, Real Intent also conditions the receipt of a benefit (such as glitch detection and/or verification/signoff of customer circuit designs through the 394 Accused Products) upon performance of claim 1 steps of the 394 patent for glitch detection of circuit designs.  On information and belief, Real Intent customers can neither use the 394 Accused Products without entering into a contract with Real Intent, nor use the 394 Accused Products for glitch detection and/or verification/signoff of IC designs without performance of the steps of at least claim 1 of the 394 patent.

112.    On information and belief, Real Intent establishes the manner and timing of customer performance of one or more steps of the 394 patent.  For example, as alleged herein, Real Intent requires its customers to enter into contracts in order to access the 394 Accused Products

and, upon information and belief, these contracts control the number of customer engineers that can access the 394 Accused Products and where they can access. As a further example, Real Intent employs application engineers who work with customers to set up, optimize, and support their use of Real Intent's tools, including the 394 Accused Products. On information and belief, these application engineers establish the manner in which its customers perform glitch detection by leveraging information from higher and lower levels of abstraction, such as the RTL and Netlist levels, as evidenced by the above-referenced Real Intent materials on CDC and Glitch verification. Real Intent also touts advantages provided by the methods of the 394 patent, including, for example by advertising the capabilities of the 394 Accused products at the 2025 DVCON conference.[18]

113.    Additionally, Real Intent is liable for inducing infringement of the 394 patent by its customers, either literally or under the doctrine of equivalents. As discussed above, Real Intent's customers perform all steps of claim 1 of the 394 patent when performing glitch detection using the 394 Accused Products. Real Intent knew of the 394 patent at least as of February 7, 2020 and knew that the glitch detection process of the 394 Accused Products infringe at least claim 1 of the 394 patent at least by February 7, 2020. Upon information and belief, Real Intent intended for its customers to infringe the 394 patent at least by February 7, 2020.

114.    Insofar as Real Intent contends it was unknowledgeable of the 394 patent and/or its infringement thereof, any conceivable lack of knowledge is solely owing to Real Intent's willful blindness. Real Intent has been aware that its Meridian products compete with Synopsys' SpyGlass and VC SpyGlass products. Real Intent has also been aware that Synopsys' SpyGlass and VC SpyGlass products compete in static verification. Real Intent has also been aware of Synopsys' significant patent portfolio. Therefore, Real Intent has been aware that Synopsys has

---

[18] *See*, *e.g.*, Ex. 7

patents covering static verification methods.  Additionally, Real Intent benchmarks its products against Synopsys' products, and therefore, has been aware of the capabilities of Synopsys' products, including, on information and belief, glitch detection capabilities.  Given Real Intent's awareness of Synopsys' presence in static verification, Synopsys' competitive products, and Real Intent's awareness of Synopsys' patents related to static verification, as well as based on information and belief, Real Intent subjectively believed that there is a high probability that Synopsys held patents on static verification, including glitch detection, which Real Intent's customers would infringe with the 394 Accused Products, and Real Intent attempted deliberate actions to avoid learning of these facts.

115.    For at least these reasons, as well as the additional following reasons, Real Intent's direct and indirect infringement of the 394 patent has been, and continues to be, deliberate, intentional, egregious, willful and in reckless disregard of the 394 patent, entitling Synopsys to enhanced damages and attorneys' fees under 35 U.S.C. §§ 284 and 285.

116.    As alleged herein, Real Intent knew of the 394 patent no later than February 7, 2020.

117.    On information belief, Real Intent's actions of directly infringing and inducing others to infringe the 394 patent were deliberate and intentional with no reasonable validity defense.

118.    On information and belief, Real Intent developed the accused features of the 394 Accused Products to compete with Synopsys despite having knowledge that such actions infringe the 394 patent.

119.    Synopsys has been injured, and will continue to be injured, by Real Intent's deliberate and intentional direct and indirect infringement of the 394 patent.

## COUNT 3: INFRINGEMENT OF U.S. PATENT NO. 8,650,513

120.     Synopsys repeats, incorporates by reference, and realleges all foregoing paragraphs of this Complaint as if fully set forth herein.

121.     As explained above, the 513 patent claims a novel method for reducing X-pessimism during simulation of a circuit design.  Real Intent has directly infringed and continues to infringe at least claim 1 of the 513 patent by making, using, offering for sale within the United States and/or importing into the United States its 513 Accused Products.  Claim 1 of the 513 patent states:

> 1. A method for reducing X-pessimism, the method comprising:
>
> identifying a set of reconvergent inputs of a combinational block in a gate-level design; and
>
> in response to determining that the combinational block is expected to exhibit X-pessimism during gate-level simulation, adding, by computer, a correcting block to the gate-level design, wherein an output of the combinational block or the correcting block is selected based on the values of the set of reconvergent inputs.

122.     The Real Intent products that infringe the 513 patent include at least Ascent XV, Meridian RXV, Verix SimFix, SimPortal, Ascent AutoFormal, Sentry, and any other product incorporating substantially similar functionality (the "513 Accused Products").  On information and belief, the 513 Accused Products satisfy all limitations of at least claim 1 of the 513 patent.

123.     On information and belief, the 513 Accused Products satisfy all the limitations of claim 1 of the 513 patent.

124.     Claim 1 of the 513 patent recites "[a] method for reducing X-pessimism."  The 513 Accused Products satisfy this aspect of claim 1.  For example, RI's Ascent XV product was advertised as having a feature that "eliminates unnecessary X's caused by X-pessimism at the

netlist level that make design debug difficult."[19]  In addition, Prakash Narain, CEO of Real Intent, was quoted on DeepChip in 2018 discussing Real Intent's "new Verix SimFix tool that automatically and mathematically fixes pessimistic X's in simulation."[20]  On information and belief, the functionality of Real Intent's Ascent XV, Meridian RXV, and/or Verix SimFix products has been incorporated into other Real Intent products, including, but not limited to, SimPortal, Ascent AutoFormal, and Sentry.

125.    Claim 1 of the 513 patent further recites "identifying a set of reconvergent inputs…."  The 513 Accused Products satisfy this aspect of claim 1.  For example, Ascent XV can "[r]un static analysis to determine which data input values can cause monitored nodes to exhibit pessimism."[21]  In addition, Real Intent's Senior Marketing Manager, Lisa Piper, explained in a YouTube video that Real Intent's products "do a static analysis on the design itself prior to even getting to the simulator. And in the static analysis we identify the potential pessimism points in the design."[22]

126.    Claim 1 of the 513 patent further recites "in response to determining … adding, by computer, a correcting block…."  The 513 Accused Products satisfy this aspect of claim 1.  For example, Dr. Narain stated in a "DeepChip" interview that "SimFix pre-processes your design, using mathematical techniques to identify potential pessimistic conditions in the design, and notes the correct value under those conditions.  It then generates auxiliary SimPortal files that, when

---

[19] https://www.realintent.com/real-intent-unveils-major-enhancements-in-ascent-xv-for-early-detection-and-management-of-unknowns-in-digital-designs/.
[20] https://www.deepchip.com/items/0583-02.html.
[21] https://www.techdesignforums.com/practice/technique/x-pessimism-netlists-real-intent/.
[22] https://www.youtube.com/watch?v=0WSqd-uyN3M.

used in simulation, will monitor the simulation and fix X-pessimism when it occurs."[23] In addition, Dr. Narain noted the following:[24]



127.    In light of the above-discussed materials, Real Intent directly infringes at least claim 1 of the 513 patent, either literally or under the doctrine of equivalents, through at least its use of the 513 Accused Products, including, for example, testing the 513 Accused Products.

128.    Additionally, all requirements by Real Intent on its customers to perform one or more steps recited in claim 1 of the 513 patent, and any such action by Real Intent customers, is attributable to Real Intent such that Real Intent is directly liable for joint infringement of claim 1, because Real Intent directs and controls the conduct of its customers with respect to infringement. In this regard, Real Intent conditions participation in activities, as well as the receipt of benefits, upon performance of any such step by its customer, and Real Intent establishes the manner and timing of that performance.

---

[23] https://www.deepchip.com/items/0583-02.html.
[24] https://www.deepchip.com/items/0583-02.html.

129.    On information and belief, Real Intent enters into contractual arrangements with its customers for use of the 513 Accused Products, including Ascent XV, Meridian RXV, Verix SimFix, SimPortal, Ascent AutoFormal, and Sentry.  Thus, on information and belief, Real Intent has contracted and continues to contract with its customers to perform the claimed method, including claim 1 of the 513 patent.

130.    On information and belief, Real Intent conditions participation in reducing X-pessimism, a vital aspect of IC simulation, on the performance of claim 1 of the 513 patent.

131.    On information and belief, Real Intent conditions the receipt of the benefit, such as X-pessimism reduction and/or signoff, upon performance of the steps of the claim 1 of the 513 patent.  On information and belief, Real Intent customers can neither use the 513 Accused Products without entering into a contract with Real Intent, nor use the 513 Accused Products for X-pessimism reduction and/or signoff of IC designs without performance of the steps of at least claim 1 of the 513 patent.

132.    On information and belief, Real Intent established the manner and timing of customer performance of one or more steps of the 513 patent.  For example, as alleged herein, Real Intent requires its customers to enter into contracts in order to access the 513 Accused Products and, upon information and belief, these contracts control the number of customer engineers that can access the 513 Accused Products and where they can access.  As a further example, Real Intent employs application engineers who work with customers to optimize their use of Real Intent's tools, including the 513 Accused Products.  On information and belief, these application engineers establish the manner in which its customers perform circuit simulation by leveraging information from the customers in order to reduce X-pessimism.  Real Intent also touts advantages of the claim 1 of the 513 patent, including, for example, by advertising its capabilities regarding X-pessimism

in press releases, YouTube videos, and industry publications.  By way of further example, Dr. Narain touted to DeepChip that Real Intent's approach to X-pessimism would result in "faster runtimes" and the user's designs would "have no false passes or false failures because the mathematical analysis guarantees X-accuracy."[25]

133.    Additionally, Real Intent is liable for inducing infringement of claim 1 of the 513 patent by its customers, either literally or under the doctrine of equivalents.  As shown above, Real Intent's customers perform all the steps of at least claim 1 of the 513 patent when performing X-pessimism and/or signoff using the 513 Accused Products.  Real Intent knew of the 513 patent as of September 15, 2016 and knew that the method for X-pessimism reduction and signoff used by the 513 Accused Products product infringes at least claim 1 of the 513 patent at least as early as September 15, 2016.  On information and belief, Real Intent intended for its customers to infringe at least claim 1 of the 513 patent at least as early as September 15, 2016.

134.    Insofar as Real Intent contends it was unknowledgeable of the 513 patent and/or infringement, any conceivable lack of knowledge is owing to Real Intent's willful blindness alone. Real Intent has been aware that its 513 Accused Products compete with Synopsys' VCS and Verdi products.  Therefore, Real Intent has further been aware that Synopsys has patents covering static verification methods.  Additionally, Real Intent benchmarks its products against Synopsys' products, and therefore, has been aware of Synopsys' products' capabilities, including, on information and belief, Synopsys' product X-pessimism reduction and signoff capabilities.  Thus, based on Real Intent's awareness of Synopsys' competing products, and Real Intent's awareness of Synopsys' static verification patents, as well as based on information and belief, Real Intent subjectively believed that there is a high probability that Synopsys held patents on X-pessimism

---

[25] https://www.deepchip.com/items/0583-02.html.

reduction and sign-off, which Real Intent's customers would infringe with the 513 Accused Products, and Real Intent attempted deliberate actions to avoid learning of these facts.

135.    For at least these reasons, as well as the additional following reasons, Real Intent's direct and indirect infringement of the 513 patent has been, and continues to be, deliberate, intentional, egregious, willful and in reckless disregard of at least claim 1 of the 513 patent, entitling Synopsys to enhanced damages and attorneys' fees under 35 U.S.C. §§ 284 and 285.

136.    As alleged herein, Real Intent knew of the 513 patent no later than September 15, 2016.

137.    On information belief, Real Intent's actions of direct infringement and inducing others to infringe the 513 patent were deliberate and intentional with no reasonable validity defense.

138.    On information and belief, Real Intent developed the accused features of the 513 Accused Products to compete with Synopsys despite having knowledge that such actions infringe the 513 patent.

139.    Synopsys has been injured, and will continue to be injured, by Real Intent's deliberate and intentional direct and indirect infringement of the 513 patent.

## COUNT 4: INFRINGEMENT OF U.S. PATENT NO. 8,359,560

140.    Synopsys repeats, incorporates by reference, and realleges all foregoing paragraphs of this Complaint as if fully set forth herein.

141.    As explained above, the 560 patent claims a novel method for debugging IC designs at multiple design levels.  Real Intent has directly infringed and continues to infringe at least claim 1 of the 560 patent by making, using, offering for sale within the United States and/or importing into the United States its Accused Products.  Claim 1 of the 560 patent discloses:

1. A computer-implemented method for debugging designs, comprising:

obtaining signal correlation information for signals of a design at least two design levels, by using a computer;

loading and presenting design descriptions corresponding to the design at the least two design levels in at least two sets of windows, by using the computer;

receiving a selection of a first signal in a first set of windows, by using the computer;

in response to the selection of the first signal, querying a second signal corresponding to the first signal according to the signal correlation information, so as to select the second signal in a second set of windows, by using the computer;

executing at least two debugging processes, by using the computer, each responsible for loading one of the design descriptions at the at least two design levels, and each in control of one of the at least two sets of windows for debugging the loaded design, wherein each debugging process has a plurality of windows;

receiving a drag of the first signal from a first window in a first debugging process to a second window in a second debugging process, by using the computer; and

in response to a synchronization information comprising the drag of the first signal, locating the second signal in the second window in the second debugging process, by using the computer.

142.    The Real Intent products that infringe the 560 patent include at least iDebug (including iVision) and SafeConnect, and any other product incorporating substantially similar functionality (the "560 Accused Products").

143.    On information and belief, the 560 Accused Products satisfy all the limitations of at least claim 1 of the 560 patent.

144.    Claim 1 of the 560 patent recites "[a] computer-implemented method for debugging designs." The 560 Accused Products satisfy this aspect of claim 1. For example, "iDebug is the state-of-the-art debugging environment for its suite of products for the verification of digital

designs. iDebug provides an intuitive debugging experience that is universal across all Real Intent tools."[26]

145.    Claim 1 of the 560 patent further recites "obtaining signal correlation information…."  The 560 Accused Products satisfy this aspect of claim 1.  For example, Real Intent's SafeConnect product integrates Real Intent's iDebug environment.[27]  In addition, as Real Intent's website states, "SafeConnect is deployed during key stages of the IP and SoC design process":[28]



On information and belief, because SafeConnect runs the same checks on both the RTL and the Netlist, it uses information to correlate the two checks.  On information and belief, that information is provided to iDebug when the results are displayed to the user.

---

[26] https://www.realintent.com/products/.

[27] https://www.realintent.com/connectivity-glitch-sign-off-safeconnect/.

[28] https://www.realintent.com/connectivity-glitch-sign-off-safeconnect/.

146.    Claim 1 of the 560 patent further recites "loading and presenting design descriptions … in at least two sets of windows…."  The 560 Accused Products satisfy this aspect of claim 1.  For example, iDebug structures its graphical user interface using "windows."[29]  In addition, Real Intent's iDebug product integrates another tool called iVision, which operates in a separate window.[30]  As Real Intent's website explains, "[t]he integrated iVision visualization capability enables users to browse source code relevant to violations. It also includes an easy-to-navigate schematics view to debug specific violations."[31]

147.    Claim 1 of the 560 patent further recites "receiving a selection of a first signal…."  The 560 Accused Products satisfy this aspect of claim 1.  For example, a user can select a signal using an iDebug window.[32]  In addition, on information and belief, SafeConnect and iDebug permit a user to select a signal at a first design level.

148.    Claim 1 of the 560 patent further recites "in response to the selection of the first signal, querying a second signal…."  The 560 Accused Products satisfy this aspect of claim 1.  For example, switching between iVision and iDebug will "update the schematic" with new information.[33]  In addition, on information and belief, SafeConnect and iDebug permit a user to select a signal in the second design level, in a second window, that corresponds to a signal in the first design level.

149.    Claim 1 of the 560 patent further recites "executing at least two debugging processes…."  The 560 Accused Products satisfy this aspect of claim 1.  For example, iVision and

---

[29] https://www.youtube.com/watch?v=8S9BgEvTERc.
[30] https://www.youtube.com/watch?v=8S9BgEvTERc.
[31] https://www.realintent.com/intent-driven-debug-idebug/.
[32] https://www.youtube.com/watch?v=8S9BgEvTERc.
[33] https://www.youtube.com/watch?v=8S9BgEvTERc.

iDebug can be operated simultaneously in different windows.[34]  On information and belief, iDebug and iVision operate separate debugging processes.   In addition, on information and belief, SafeConnect and iDebug conduct separate debugging processes for each set of windows.

150.    Claim 1 of the 560 patent further recites "receiving a drag of the first signal…." The 560 Accused Products satisfy this aspect of claim 1.  For example, on information and belief, SafeConnect, iDebug, and iVision permit a user to drag a first signal from one window in a first debugging process to a second window in a second debugging process.

151.    Claim 1 of the 560 patent further recites "in response to a synchronization information … locating the second signal…."  The 560 Accused Products satisfy this aspect of claim 1.  For example, on information and belief, SafeConnect, iDebug and iVision locate a second signal in response to the drag of a first signal.

152.    In light of the above-discussed materials, Real Intent directly infringes at least claim 1 of the 560 patent, either literally or under the doctrine of equivalents, through at least its use of the 560 Accused Products, including, for example, testing the 560 Accused Products.

153.    Additionally, all requirements by Real Intent on its customers to perform one or more steps recited in claim 1 of the 560 patent, and any such action by Real Intent customers, is attributable to Real Intent such that Real Intent is directly liable for joint infringement of claim 1, because Real Intent directs and controls the conduct of its customers with respect to infringement. In this regard, Real Intent conditions participation in activities, as well as the receipt of benefits, upon performance of any such step by its customer and end-users, and Real Intent establishes the manner and timing of that performance.

---

[34] https://www.youtube.com/watch?v=8S9BgEvTERc.

154.    On information and belief, Real Intent enters into contractual arrangements with its customers for use of the 560 Accused Products, including, for example, iDebug (including iVision) and SafeConnect.  Thus, on information and belief, Real Intent has contracted and continues to contract with its customers to perform the claimed methods, including at least claim 1 of the 560 patent.

155.    On information and belief, Real Intent conditions participation in debugging IC designs, vital aspect of IC development, on the performance of at least claim 1 of the 560 patent.

156.    On information and belief, Real Intent conditions the receipt of the benefit, such as the ability to debug an IC design at multiple design levels, upon performance of the steps of at least claim 1 of the 560 patent.  On information and belief, Real Intent customers can neither use the 560 Accused Products without entering into a contract with Real Intent, nor use the 560 Accused Products to debug an IC design at multiple design levels without performance of the steps of at least claim 1 of the 560 patent.

157.    On information and belief, Real Intent established the manner and timing of customer performance of one or more steps of at least claim 1 of the 560 patent.  For example, as alleged herein, Real Intent requires its customers to enter into contracts in order to access the 560 Accused Products and, upon information and belief, these contracts control the number of customer engineers that can access the 560 Accused Products and where they can access.  As a further example, Real Intent employs application engineers who work with customers to optimize their use of Real Intent's tools.  On information and belief, these application engineers establish the manner in which its customers debug IC designs by leveraging information from the customers in order to permit such debugging at multiple design levels.  Real Intent also touts advantages of the claim 1 of the 560 patent, including, for example, by advertising its capabilities regarding

debugging on its website.  By way of further example, Real Intent advertises that its iDebug product allows users to "distinguish the root cause of issues, and minimize iterations and debug time."[35]

158.    Additionally, Real Intent is also liable for inducing infringement of at least claim 1 of the 560 patent by its customers, either literally or under the doctrine of equivalents.  As shown above, Real Intent's customers perform all the steps of claim 1 of the 560 patent when debugging IC designs using the 560 Accused Products.  As alleged herein, Real Intent knew of the 560 patent at least as of 2018, or at least as of the filing of this Complaint, and knew that the method for debugging IC designs used by the 560 Accused Products product infringes claim 1 of the 560 patent at least as early as 2018.  On information and belief, Real Intent intended for its customers to infringe claim 1 of the 560 patent at least as early as 2018.

159.    Insofar as Real Intent contends it was unknowledgeable of the 560 patent and/or infringement, any conceivable lack of knowledge is owing to Real Intent's willful blindness alone. Real Intent has been aware that its 560 Accused Products compete with Synopsys' Verdi product. Therefore, Real Intent has further been aware that Synopsys has patents covering methods for debugging.  Additionally, Real Intent benchmarks its products against Synopsys' products, and therefore, is aware of Synopsys' products' capabilities, including, on information and belief, capabilities directed to debugging of integrated circuits.  Thus, based on Real Intent's awareness of Synopsys' presence in the market, Synopsys' competitive products, and Real Intent's awareness of other patents in this suit on static verification, as well as based on information and belief, Real Intent subjectively believed that there is a high probability that Synopsys held patents on IC

---

[35] https://www.realintent.com/intent-driven-debug-idebug/.

debugging, which Real Intent's customers would infringe with the 560 Accused Products, and Real Intent attempted deliberate actions to avoid learning of these facts.

160.    For at least these reasons, as well as the additional following reasons, Real Intent's direct and indirect infringement of the 560 patent has been, and continues to be, deliberate, intentional, egregious, willful and in reckless disregard of at least claim 1 of the 560 patent, entitling Synopsys to enhanced damages and attorneys' fees under 35 U.S.C. §§ 284 and 285.

161.    As alleged herein, Real Intent knew of the 560 patent at least as of 2018.

162.    On information belief, Real Intent's actions of direct infringement and inducing others to infringe the 560 patent were deliberate and intentional with no reasonable validity defense.

163.    On information and belief, Real Intent developed the accused features of the 560 Accused Products to compete with Synopsys despite having knowledge that such actions infringe the 560 patent.

164.    Synopsys has been injured, and will continue to be injured, by Real Intent's deliberate and intentional direct and indirect infringement of the 560 patent.

## **COUNT 5: INFRINGEMENT OF U.S. PATENT NO. 10,289,773**

165.    Synopsys repeats, incorporates by reference, and realleges foregoing paragraphs of this Complaint as if fully set forth herein.

166.    As explained above, the 773 patent claims novel methods of managing RDCs by leveraging information from the PDCs.  Real Intent has directly infringed and continues to infringe at least claim 1 of the 773 patent by making, using, offering for sale within the United States and/or importing into the United States its Accused Products.  For example, claim 1 of the 773 patent states:

1. A method of efficiently addressing reset domain crossings (RDCs) and power domain crossings (PDCs) in an initial circuit design, said initial circuit design including a plurality of circuit structures and a plurality of signals passing between said plurality of circuit structures, said initial circuit design being defined by an initial Hardware Description Language (HDL) description in which each of said plurality of circuit structures is assigned to an associated reset domain of a plurality of reset domains such that one or more of said plurality of signals forms a corresponding said RDC between two reset domains of said plurality of reset domains, said initial circuit design being further defined by an initial Unified Power Format (UPF) description in which each of said plurality of circuit structures is further assigned to an associated power domain of a plurality of power domains such that one or more of said plurality of signals forms a corresponding said PDC between two power domains of said plurality of power domains, the method comprising:

utilizing both said initial HDL description and said initial UPF description to identify at least one signal of said plurality of signals that forms both a corresponding said RDC and a corresponding said PDC;

generating a report indicating that said at least one signal is a candidate for a shared RDC/PDC isolation structure.

167.    The Real Intent products that infringe the 773 patent include at least Meridian RDC, SafeConnect and any other product incorporating substantially similar functionality (the "773 Accused Products").  On information and belief, the 773 Accused Products satisfy all limitations of at least claim 1 of the 773 patent.

168.    Claim 1 of the 773 patent recites utilizing HDL and UPF circuit descriptions to identify signals forming RDCs and PDCs.  The 773 Accused Products satisfy this aspect of claim 1.  For example, Real Intent's website, excerpted below, indicates the 773 Accused Products incorporate "[p]ower related resets" when doing RDC verification.[36]  On information and belief, the 773 Accused Products perform this using the UPF industry standard.  These power specifications provide critical information about the power domains within the design.  By modeling these power domains and their interactions with reset sequences, the 773 Accused

---

[36] https://www.realintent.com/samsung-rdc-sign-off-low-power-socs/# (emphasis added).

Products understand how power events impact the stability of signals crossing reset domains, therefore they identify signals forming RDCs and PDCs.



169.    Further, the diagram reproduced below from Real Intent's website shows that the 773 Accused Products read UPF format.[37]

---

[37] https://www.realintent.com/architectural-compliance-checking-shift-left-using-static-sign-off/.



170.    Claim 1 of the 773 patent further recites "utilizing both said initial HDL description and said initial UPF description to identify at least one signal of said plurality of signals that forms both a corresponding said RDC and a corresponding said PDC."  The 773 Accused Products satisfy this aspect of claim 1.  For example, the excerpt reproduced below from Real Intent's website shows that the 773 Accused Products incorporate "[p]ower related resets" when doing RDC verification, thereby identifying signals that form both a corresponding said RDC and a corresponding said PDC.[38]

---

[38] https://www.realintent.com/samsung-rdc-sign-off-low-power-socs/#  (emphasis added).

**Power related resets**

- Resets coming from local power management to reset regions that are an always-on power domain.
- Resets coming from local power management to reset regions inside specific power domains before power gating.
- Paths determined to be false paths because of a constraint between the reset crossing paths were specified as false paths to filter them and not report them as violations, improving the review efficiency.

171.    Claim 1 of the 773 patent further recites "generating a report indicating that said at least one signal is a candidate for a shared RDC/PDC isolation structure." The 773 Accused Products satisfy this aspect of claim 1. For example, the excerpt above from Real Intent's website indicates that the 773 Accused Products identify resets coming from local power management to reset regions inside *specific power domains*." On information and belief, this means that the 773 Accused Products generate a report identifying signals for shared RDC/PDC isolation structures. Additionally, the case study on Real Intent's website from which the excerpt above is reproduced states that "the reports are low noise. For reported violations that Samsung determines are not real errors due to specific conditions, they use waivers to ensure the same violation is not shown again after the next iteration of RDC analysis." Therefore, Real Intent advertises that its tools generate a report containing information regarding shared RDC/PDC isolation structures.

172.    Further, as reflected in the image reproduced below from slide 37 of Exhibit 7, Real Intent's SafeConnect tool is used to check isolation cells and signal connectivity.[39] On information and belief, this indicates the SafeConnect tool may be used along with Meridian RDC to identify signals that are candidates for a shared RDC/PDC isolation structure.

---

[39] Ex. 7 at 37.



173.    In light of the above-discussed materials, Real Intent directly infringes at least claim 1 of the 773 patent, either literally or under the doctrine of equivalents, through at least its use of the 773 Accused Products, including, for example, testing the 773 Accused Products.

174.    Additionally, all requirements by Real Intent on its customers to perform one or more steps recited in at least claim 1 of the 773 patent, and any such action by Real Intent customers, is attributable to Real Intent such that Real Intent is directly liable for joint infringement of at least claim 1, because Real Intent directs and controls the conduct of its customers with respect to infringement.  In this regard, Real Intent conditions participation in activities, as well as the receipt of benefits, upon performance of any such step by its customer and end-users, and Real Intent establishes the manner and timing of that performance.

175.    On information and belief, Real Intent enters into contractual arrangements with its customer for use of the 773 Accused Products, including, for example, Meridian RDC.  Thus, on information and belief, Real Intent has contracted and continues to contract with its customers to perform the claimed methods, including at least claim 1 of the 773 patent.

176.    On information and belief, Real Intent conditions participation in performing RDC, a vital aspect of IC verification, on the performance of one or more claims of the 773 patent, including at least claim 1.

177.    On information and belief, Real Intent conditions the receipt of the benefit, such as RDC verification, upon performance of the steps of one or more claims of the 773 patent.  On information and belief, Real Intent customers can neither use the 773 Accused Products without entering into a contract with Real Intent, nor use the 773 Accused Products for RDC verification of IC designs without performance of the steps of at least claim 1 of the 773 patent.

178.    On information and belief, Real Intent established the manner and timing of customer performance of one or more steps of the 773 patent.  For example, as alleged herein, Real Intent requires its customers to enter into contracts in order to access the 773 Accused Products and, upon information and belief, these contracts control the number of customer engineers that can access the 773 Accused Products and where they can access.  As a further example, Real Intent employs application engineers who work with customers to set up, optimize, and use Real Intent's tools.  On information and belief, these application engineers establish the manner in which its customers perform RDC verification by leveraging information from PDCs in order to optimize verification time and accuracy.  Real Intent also touts advantages of one or more claims of the 773 patent, including, for example by advertising Samsung's performance of the claimed patent (in the above-discussed case study).[40]

179.    Additionally, Real Intent is liable for inducing infringement of the 773 patent by its customers, either literally or under the doctrine of equivalents.  As shown above, Real Intent's customers perform all the steps of one or more claims of the 773 patent when performing reset

---

[40] https://www.realintent.com/samsung-rdc-sign-off-low-power-socs/.

domain crossing using the 773 Accused Products.  Real Intent knew of the 773 patent at least as of April 3, 2020, and knew that the process of determining power related resets performed by the 773 Accused Products infringe the 773 patent at least as early as April 3, 2020.  On information and belief, Real Intent intended for its customers to infringe the 773 patent at least as early as April 3, 2020.

180.     Insofar as Real Intent contends it was unknowledgeable of the 773 patent and/or its infringement, any conceivable lack of knowledge is solely owing to Real Intent's willful blindness. Real Intent has been aware that the 773 Accused Products compete with Synopsys' SpyGlass and VC SpyGlass products.  Therefore, Real Intent has further been aware that Synopsys has patents related to static verification methods.  Additionally, Real Intent benchmarks its products against Synopsys' products, and therefore, has been aware of Synopsys' product capabilities, including, on information and belief, RDC management.  Thus, based on Real Intent's awareness of Synopsys' presence in the market, Synopsys' competitive products, and Real Intent's awareness of Synopsys' significant patent portfolio and patent related to static verification, as well as based on information and belief, Real Intent subjectively believed that there is a high probability that Synopsys held patents on static verification, including RDC management, which Real Intent's customers would infringe with the 773 Accused Products, and Real Intent attempted deliberate actions to avoid learning of these facts.

181.     For at least these reasons, as well as the additional following reasons, Real Intent's direct and indirect infringement of the 773 patent has been, and continues to be, deliberate, intentional, egregious, willful and in reckless disregard of at least claim 1 of the 773 patent, entitling Synopsys to enhanced damages and attorneys' fees under 35 U.S.C. §§ 284 and 285.

182.     As alleged herein, Real Intent knew of the 773 patent no later than April 2020.

183.    On information belief, Real Intent's actions of directly infringing and inducing others to infringe the 773 patent were deliberate and intentional with no reasonable validity defense.

184.    On information and belief, Real Intent developed the accused features of the 773 Accused Products to compete with Synopsys despite having knowledge that such actions infringe the 773 patent.

185.    Synopsys has been injured, and will continue to be injured, by Real Intent's deliberate and intentional direct and indirect infringement of the 773 patent.

## COUNT 6: INFRINGEMENT OF U.S. PATENT NO. 9,529,948

186.    Synopsys repeats, incorporates by reference, and realleges all foregoing paragraphs of this Complaint as if fully set forth herein.

187.    As explained above, the 948 patent claims an innovative method of efficiently performing functional verification by minimizing the number of crossover paths that need to be evaluated.  The 948 patent teaches a method of first generating a set of crossover paths, then using power information to reduce the number of crossover paths that need to be analyzed.  Real Intent has directly infringed and continues to infringe at least claim 1 of the 948 patent by making, using, offering for sale within the United States and/or importing into the United States its Accused Products.  For example, claim 1 of the 948 patent discloses:

1. A method for functional verification of a circuit description utilizing a power design description, the method comprising:

generating a first set of crossover paths based on the circuit description;

generating a low power information based on the power design description being associated with the circuit description, the low power information determining a set of power state combinations;

generating a second set of crossover paths based on the first set of crossover paths and the low power information, the second set of crossover paths being a subset of the first set of crossover paths; and

evaluating each of the second set of crossover paths to identify functional circuit description errors.

188.    The Real Intent products that infringe the 948 patent include at least Meridian CDC, Meridian RDC, SafeConnect, and any other product incorporating substantially similar functionality (the "948 Accused Products"). On information and belief, the 948 Accused Products satisfy all limitations of at least claim 1 of the 948 patent.

189.    The 948 patent claims generating a first set of crossover paths based on the circuit description. Crossover paths may be determined based on reset domain crossings or clock domain crossings. The 948 patent provides clock domain crossings as one example of crossover paths. The 948 Accused Products generate crossover paths based on a circuit description using both reset and clock domain crossings, both of which literally meet the limitations of at least claim 1 of the 948 patent. To the extent that determining crossover paths based on reset domain crossings is not literally included in the scope of the 948 patent claims, they are included under the doctrine of equivalents.

190.    As explained in the 948 patent, a crossover path is a signal path that cross power domains. 948 patent at 1:65-2:4. Signal paths that cross power domains can also cross clock domains and reset domains as well. Therefore, while the 948 patent discloses embodiments in which the crossover paths are clock domain crossing paths, the 948 patent's methods can also be applied to reset domain crossing paths and achieve the same results.

191.    On information and belief, the 948 Accused Products satisfy all the limitations of at least claim 1 of the 948 patent.

192.    Claim 1 of the 948 patent recites "method for functional verification of a circuit description utilizing a power design description…."  The 948 Accused Products satisfy this aspect of claim 1.  For example, according to Real Intent's website, "Meridian CDC comprehensively analyzes clock/reset structures and identifies all possible CDC issues … that need functional verification."[41]  Therefore, the 948 Accused Products perform a method for functional verification.  Further, the image below[42] evidences that the 948 Accused Products read UPF format, which is a power design description.



193.    Claim 1 of the 948 patent further recites "generating a first set of crossover paths based on the circuit description"  The 948 Accused Products satisfy this aspect of claim 1.  For example, the screen capture from a recorded Real Intent presentation at the Design Automation

---

[41] https://www.realintent.com/clock-domain-crossing-meridian-cdc/.

[42] https://www.realintent.com/architectural-compliance-checking-shift-left-using-static-sign-off/.

Conference (DAC), reproduced below, shows use of the 948 Accused Products for generating crossover paths based on circuit descriptions.[43]



194.    On information and belief, the 948 Accused Products' support for and use of false paths infringes at least claim 1 of the 948 patent.  A "false path" is a logical connection within a circuit that exists in reality but is intentionally excluded from timing analysis because it is considered functionally impossible to activate under normal operating conditions, meaning the path will never be used; therefore, it can be ignored when checking for timing violations.

195.    The 948 patent covers a form of using false paths because it teaches forming two sets of crossover paths, wherein the second set is a narrowed down version of the first set, narrowed down using power information to identify the paths that will not be used.  Therefore, the paths that are not in the first set, but are in the second set, are false paths to be ignored.

196.    Claim 1 of the 948 patent further recites "generating a low power information based on the power design description being associated with the circuit description, the low power

---

[43] https://www.youtube.com/watch?v=PQzDPdU1ncA&list=PLKqCo4MpJlW-P3IFtHje0F1L6Y5_X2e9F&index=2 at 8:49 (emphasis added).

information determining a set of power state combinations…." The 948 Accused Products satisfy this aspect of claim 1. For example, according to Real Intent's website SafeConnect "define[s] connectivity rules," which requires checking "power logic," and "reads UPF and performs analysis."[44] Additionally, slide 37 of Exhibit 7, reproduced below, indicates that SafeConnect can be used to handle power related issues such as reset connections and isolation cells.[45] On information and belief, the 948 Accused Products generate low power information and determine a set of power combinations.



197.    Further, according to slide 43 of Exhibit 7, shown below, Real Intent's SafeConnect tool performs connectivity checking, and thus, on information and belief, SafeConnect utilizes low power information to determine a set of power state combinations.[46]

---

[44] https://www.realintent.com/connectivity-glitch-verification-acceleration-for-vlsi-designs-using-static-methodology/
[45] Ex. 7 at 37
[46] Ex. 7 at 43



198.    Claim 1 of the 948 patent further recites "generating a second set of crossover paths based on the first set of crossover paths and the low power information, the second set of crossover paths being a subset of the first set of crossover path."   The 948 Accused Products satisfy this aspect of claim 1.  For example, according to Real Intent's website, its customer, such as Samsung, use Meridian RDC in conjunction with low power information.[47]  On information and belief, this evidences that the 948 Accused Products generate two sets of crossover paths wherein the second set is a subset of the first set and is determined based on low power information.



---

[47] https://www.realintent.com/samsung-rdc-sign-off-low-power-socs/.

199.    Claim 1 of the 948 patent further recites "evaluating each of the second set of crossover paths to identify functional circuit description errors." The 948 Accused Products satisfy this aspect of claim 1. For example, the above-reproduced excerpt from Real Intent's website indicates that Real Intent customers, such as Samsung, use Meridian RDC to identify functional failures. Therefore, on information and belief, the 948 Accused Products evaluate each of the second set of crossover paths to identify functional failures, *i.e.*, functional circuit description errors.

200.    In light of the above materials, Real Intent directly infringes at least claim 1 of the 948 patent, either literally or under the doctrine of equivalents, through at least its use of the 948 Accused Products, including, for example, testing the 948 Accused Products

201.    Additionally, all requirements by Real Intent on its customers to perform one or more steps recited in at least claim 1 of the 948 patent, and any such action by Real Intent customers, is attributable to Real Intent such that Real Intent is directly liable for joint infringement of at least claim 1 of the 948 patent, because Real Intent directs and controls the conduct of its customers with respect to the infringing activities. In this regard, Real Intent conditions participation in activities, as well as the receipt of benefits, upon performance of any such step by its customer and end-users, and Real Intent establishes the manner and timing of that performance.

202.    On information and belief, Real Intent enters into contractual arrangements with its customer for use of the 948 Accused Products, including, for example, Meridian CDC and Meridian RDC. Thus, on information and belief, Real Intent has contracted and continues to contract with its customers to perform the claimed methods, including at least claim 1 of the 948 patent.

203.    On information and belief, Real Intent conditions the receipt of the benefit of efficient CDC and RDC verification on performance of the steps of at least claim 1 of the 948 patent.  On information and belief, Real Intent customers can neither use the 948 Accused Products without entering into a contract with Real Intent, nor use the 948 Accused Products for RDC verification of IC designs without performance of the steps of at least claim 1 of the 948 patent.

204.    On information and belief, Real Intent established the manner and timing of customer performance of one or more steps of the 948 patent.  For example, as alleged herein, Real Intent requires its customers to enter into contracts in order to access the 948 Accused Products and, upon information and belief, these contracts control the number of customer engineers that can access the 948 Accused Products and where they can access.  As a further example, Real Intent employs application engineers who work with customers to setup, optimize, and use the 948 Accused Products.  On information and belief, these application engineers establish the manner in which its customers perform RDC and CDC verification including the identification of false paths.  Real Intent also touts advantages of the 948 patent, including, for example by advertising Samsung's performance of the claimed patent (in the above cited case study).[48]

205.    Additionally Real Intent is liable for inducing infringement of at least claim 1 of the 948 patent by its customers, either literally or under the doctrine of equivalents.  As discussed above, Real Intent's customers perform all the steps of at least claim 1 of the 948 patent when determining nonfunctional paths based on low power information.  As alleged herein, Real Intent knew of the 948 patent at least since 2018 when it searched for Synopsys static verification patents and knew that the 948 Accused Products' processes for determining nonfunctional paths based on low power information infringed at least claim 1 of the 948 patent.  On information and belief,

---

[48] https://www.realintent.com/samsung-rdc-sign-off-low-power-socs/.

Real Intent intended for its customers to infringe at least claim 1 of the 948 patent no later than 2018.

206.    Insofar as Real Intent contends it was unknowledgeable of the 948 patent and/or the 948 Accused Products' infringement of the 948 patent, any conceivable lack of knowledge is solely owing to Real Intent's willful blindness.  Real Intent has long been aware that the 948 Accused Products compete with Synopsys' SpyGlass and VC SpyGlass products.  Therefore, Real Intent has further been aware that Synopsys has patents covering static verification methods. Additionally, Real Intent benchmarks its products against Synopsys' products, and therefore, has been aware of the capabilities of Synopsys' products, including on information and belief, determining nonfunctional crossover paths.  Thus, based on Real Intent's awareness of Synopsys' presence in static verification, Synopsys' competitive products, and Real Intent's awareness of Synopsys' significant patent portfolio and patents related to static verification, as well as based on information and belief, Real Intent subjectively believed that there is a high probability that Synopsys held patents on static verification, including determining nonfunctional crossover paths, which Real Intent's customers would infringe with the 948 Accused Products, and Real Intent attempted deliberate  actions to avoid learning of these facts.

207.    For these reasons and the following, Real Intent's direct and indirect infringement of the 948 patent has been, and continues to be, deliberate, intentional, egregious, willful and in reckless disregard of at least claim 1 of the 948 patent, entitling Synopsys to enhanced damages and attorneys' fees under 35 U.S.C. §§ 284 and 285.

208.    As alleged herein, Real Intent knew of the 948 patent since at least 2018.

209.    On information belief, Real Intent's actions of direct infringement and inducing others to infringe the 948 patent were deliberate and intentional with no reasonable validity defense.

210.    On information and belief, Real Intent developed the accused features of the 948 Accused Products to compete with Synopsys despite having knowledge that such actions infringe the 948 patent.

211.    Synopsys has been injured, and will continue to be injured, by Real Intent's deliberate and intentional direct and indirect infringement of the 948 patent.

*    *    *

212.    Synopsys repeats, incorporates by reference, and realleges all foregoing paragraphs of this Complaint as if fully set forth herein.

213.    Synopsys' claims alleged herein are in compliance 35 U.S.C. § 287(a), including for example, because Section 287(a) does not apply.

## PRAYER FOR RELIEF

WHEREFORE, Synopsys respectfully requests:

A.    That Judgment be entered that Defendant has infringed and continues to infringe at least one or more claims of each of the patents-in-suit, directly (alone or jointly) and/or indirectly, literally and/or under the doctrine of equivalents, and that such infringement has been and is willful;

B.    An injunction enjoining Defendant, its officers, agents, servants, employees and attorneys, and other persons in active concert or participation with Defendant, and its parents, subsidiaries, divisions, successors and assigns, from further infringement of the patents-in-suit.

C.    An award of damages sufficient to compensate Synopsys for Defendant's infringement under 35 U.S.C. § 284, including an enhancement of damages on account of

73

Defendant's willful infringement, and including supplemental damages for any post-verdict infringement up until entry of the final judgment with an accounting as needed;

D.      That the case be found exceptional under 35 U.S.C. § 285 and that Synopsys be awarded its reasonable attorneys' fees, costs, and expenses under 35 U.S.C. § 285 and all other applicable statutes and rules in common law as may apply;

E.      An order awarding Synopsys its costs and expenses in this action pursuant to 35 U.S.C. § 284, Rule 54(d) of the Federal Rules of Civil Procedure, and all other applicable statutes and rules in common law as may apply;

F.      An award of prejudgment and post-judgment interest; and

G.      Such other and further relief as the Court may deem just and proper.

## REQUEST FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38 and D. Del. LR 38.1, Synopsys respectfully demands a trial by jury of any issue triable of right by a jury.

March 21, 2025                           YOUNG CONAWAY STARGATT
                                        & TAYLOR, LLP
OF COUNSEL:

                                        *Anne Shea Gaza*
WILLKIE FARR & GALLAGHER LLP            Anne Shea Gaza ( No. 4093)
Krista Schwartz                         Rodney Square
Barrington Dyer                         1000 North King Street
Rupali Singhal                          Wilmington, DE 19801
Jacob Karim                             agaza@ycst.com
333 Bush Street, 34th Floor             302-571-6600
San Francisco, CA 94104
415-858-7400
kschwartz@willkie.com
bdyer@willkie.com                       *Attorneys for Plaintiff*
rsinghal@willkie.com                    *Synopsys, Inc.*
jkarim@willkie.com

Dane Sowers
1875 K Street, N.W.
Washington, DC 20006
212-303-1000
dsowers@willkie.com